NO.  94-128

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

FILED

DEC 20 1994

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

IN THE MATTER OF J.S. and P.S
Youths in Need of Care.

APPEAL FROM:   District Court of the Thirteenth Judicial District,
               In and for the County of Yellowstone,
               The Honorable Marice R. Colberg, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        Curtis L. Bevolden, Hardin, Montana


        For Respondent:

        Hon. Joseph P. Mazurek, Attorney General, Pamela
        Collins, Assistant Attorney General, Helena,
        Montana; Dennis Paxinos, Yellowstone County
        Attorney, Denise Ackerman, Deputy County Attorney,
        Billings, Montana; Damon Gannett, Billings, Montana
        (Guardian Ad Litem)


                    Submitted on Briefs:  November 10, 1994

                              Decided:  December 20, 1994

Filed:

_____
                Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

This is an appeal from the termination of parental rights by the Thirteenth Judicial District Court, Yellowstone County. We affirm.

The only issue on appeal is did the District Court abuse its discretion when it terminated the parental rights of the Father and Mother of J.S. and P.S. based upon the court's conclusion that a continued relationship with J.S. and P.S. would result in continued abuse of the children?

The father and mother (Father and Mother) in this case were married and had two natural daughters, J.S. born March 20, 1989, and P.S. born January 28, 1992. Mother knew when she married Father that he had been convicted of incest with his six-year old stepdaughter to a prior marriage. The prior court had given Father a ten year suspended sentence for the 1988 incest and he was placed on the intensive supervision program: a condition of his suspended sentence was that he not have contact with any minor children.

The Department of Family Services became involved in this case in the early months of 1993 when a babysitter discovered that J.S. had a rash between her legs that was not diaper rash. J.S. told the babysitter and Mother that "Daddy touches me in my potty." Mother took no action but the incident was reported to the Department of Family Services (DFS) and in March of 1993, DFS sought a petition for Temporary Investigation Authority. The District Court granted this request.

J.S. was taken to a doctor who established that J.S. had been

2

sexually assaulted. J.S. and P.S. were taken from the home of Father and Mother and placed with the maternal grandparents. The next day the children were moved to a foster home when it was discovered that Mother had accused her own father of sexual assault when she was 17. Mother later confessed that this was a false accusation.

Mother was provided with a treatment plan on March 31, 1993, which she signed. She began counseling with Dr. Petrea Zimdar. However, this ended when Dr. Zimdar discovered that Mother had lied to her about living with Father. Mother continued to reside with Father until his incarceration later in May of 1993.

At the same time in March, 1993, Father was also provided with a treatment plan but never signed it nor complied with any of the elements of the plan. In April of 1993, Father was charged with sexually assaulting J.S. to which he admitted.

Mother continued her counseling with another counselor and on May 24, 1993, went to the Department's offices for a visit with the children. Mother arrived early for this visitation and spoke with Social Worker Ms. Nita Weyler. Ms. Weyler informed Mother that her continued association with Father would jeopardize her chances of having the children returned to her care. Ms. Weyler told Mother that unless she could dissociate from Father the Department would likely seek permanent custody.

While Ms. Weyler went to answer a telephone call, the children were brought to see Mother. She took the children, returned to the family home and retrieved Father, and drove the entire family to Rapid City, South Dakota where the family was apprehended and

3

**subsequently returned to** Montana.

Father was incarcerated on May 28, 1993, and remains in jail. On September 2, 1993, he pled guilty to sexual assault with J.S. From the time of Father's incarceration, Mother continued to see him frequently in jail. She visited him 16 to 18 times prior to the court's September 24, 1993 hearing. To date, no divorce or separation proceedings have begun.

On October 17, 1993, the District Court filed its Findings of Facts and Conclusions of Law stating that J.S. and P.S. were youths in need of care and that the treatment plans of the parents had not been successful and that the children were likely to suffer continued abuse if they were returned to the parents. The court determined that Mother showed no signs of being able to protect her children from Father's abuse and that permanent custody was granted to DFS. Father had voluntarily relinquished his parental authority.

Mother appeals the District Court's termination of her parental rights.

## Standard of Review

We have recently clarified our standard of review in cases such as this where a district court has terminated the parental rights of a parent. In Matter of D.H. (1994), 264 Mont. 521, 872 P.2d 803, we stated that:

> This Court will affirm the findings of a trial court sitting without a jury unless the findings are clearly erroneous. Rule 52(a), M.R.Civ.P. . .
> We adopt the following three-part test to determine if a finding is clearly erroneous. First, the Court will review the record to see if the findings are supported by substantial evidence. Second, if the findings are

4

supported by substantial evidence we will determine if the trial court has misapprehended the effect of evidence. Third, if substantial evidence exists and the effect of the evidence has not been misapprehended the Court may still find that "[a] finding is 'clearly erroneous' when, although there is evidence to support it, a review of the record leaves the court with the definite and firm conviction that a mistake has been committed. [W]e review conclusions of law to determine whether they are correct.

However, we find that the conclusion that a child is abused and neglected involves a decision that is neither purely factual nor purely legal, and is analogous to a district court's determination of conscionability when reviewing marital and property settlement agreements.

When it determines the conscionability of a marital and property settlement agreement, a district court engages in discretionary action which cannot be accurately characterized as a finding of fact or a conclusion of law.

Matter of D.H., 264 Mont. at 524-25, 872 P.2d at 805, 806.

Did the District Court abuse its discretion when it terminated the parental rights of the Father and the Mother based upon the court's conclusion that a continued relationship with J.S. and P.S. would result in continued abuse of the children?

Mother argues that she fully complied with the treatment plan and that substantial evidence supports her retention of parental rights. She contends that DFS did not prove its case against her and that her children should be returned to her.

DFS argues that Mother has continued contact with Father and was not successful with her treatment plan. DFS contends that should Mother be given further contact with her daughters, she would not be able to protect them from Father's eventual abuse

The District Court issued the following findings of fact:

2. The Yellowstone County DFS involvement in this case resulted after it was discovered that [J.S.] was raw between her legs and it did not appear to be diaper rash. J.S. disclosed that her father . . . touched her "where

5

she . . goes potty." J.S. disclosed to a DFS social worker, Abby Cassidy, that her daddy "takes down my pants and touches me", pointing to her vagina. She indicated that it hurt when her daddy touched her and that he touched her with his hands.

3. Further investigation by the Department revealed that [Father] had plead guilty to incest charges in April of 1989. The victim in that case was a step-daughter. On September 19, 1989, [Father] was given a ten-year suspended sentence, and was placed on the intensive supervision program.

4. In conversations between social worker Abby Cassidy and [Mother], [Mother] denied that [Father] was living in the family home with her and the children. Her denial later proved to be false, [Father] was living with the family and in doing so, he violated conditions of his suspended sentence.

5. [Mother] and Mrs. Weylertestifiedthat [Mother] had knowledge that [Father] pled guilty to the incest charges against his step-daughter, but indicated that [Mother] believed that [Father] had been framed in the incest case. [Mother] allowed [Father] to have contact with her daughters despite her knowledge of his offending behavior.
. .

7. 'Mrs. Weyler testified that [Mother] visited her daughters seven times since they were placed in foster care, but has not seen her daughters since May 28, 1993, when visits with her children were restricted. The restriction resulted from a visit on May 24, 1993, when she appeared at the DFS, collected her children without the Department's consent and left with them. She later rendezvoused with her husband and, with the children, they fled the state of Montana. . . .

8. One treatment plan was developed by the Department for [Mother], which covered the dates March 29, 1993 -- May 29, 1993. The treatment plan was discussed with [Mother] and was signed by her on March 29, 1993. It was approved by this Court on May 31, 1993. [Mother] attempted to comply with the treatment plan. A treatment plan was developed for [Father], covering the dates from March 29, 1993 through May 29, 1993. [Father] never signed the treatment plan, but it was Court approved on March 31, 1993.

9. . . Mrs. Weyler testified that [Father] failed to comply with any of the requested tasks in the treatment plan. [Father] testified that he never completed a sexual offender treatment program, despite being enrolled in one in the past for the 1988 incest conviction.

10. The treatment plan for [Mother] asked her to obtain a psychological evaluation and follow the recommendations of the counselor, maintain an adequate home, and attend counseling with the sessions to address the following

areas : acceptance of responsibility for her part in the sexual abuse of her children without minimization or externalization of blame; learn the dynamics of sexual abuse and the offender cycle; learn and utilize problem-solving skills; learn and understand appropriate sex roles and behavior; explore her self-image and self-concept in relation to the sexual abuse; understand family dynamics involved when sexual abuse occurs; learn the effects of sexual abuse on the victim and increase her victim empathy; and explore the patterns of victimization in her own life as well as in her extended family. She was also asked to maintain an income, visit her children regularly, and not allow [Father] to have access to his children until deemed appropriate by the Department.

11. Mrs. Weyler testified that [Father] failed to comply with any of the tasks requested in his treatment plan.

12. [Mother] and Mrs. Weyler testified that [Mother] completed some aspects of the treatment plan, i.e., she had a psychological evaluation and attended 10 counseling session with a counselor, Dr. Recor. Prior to that she saw another counselor, Petrea Zimdar for three of five scheduled visits, and when confronted by her counselor and social worker Nita Weyler about her lack of veracity, she quit going to Ms. Zimdar.

[Mother] testified that she currently lives with her parents, has held three jobs since late May of 1993, and visited with her children regularly until she took the children in late May, 1993, and ran with them and her husband. She testified that she allowed [Father] access to her children. Both [Mother] and Mrs. Weyler testified that the majority of the treatment plan that was completed by [Mother] was completed by her after she, her husband and her children had been returned to Montana from South Dakota.

13. Mrs. Weyler testified that in her opinion the treatment plan was not a success in that [Mother] allowed her husband access to her children, and failed to protect them.

. .

15. . [Mother] testified that she continues to visit her husband in the county jail . . . Mrs. Dunbar [intake clerk at the Yellowstone County Detention Facility] also testified that [Mother] has also provided financial support for [Father] while he has been incarcerated.

16. [Mother] admitted that she has been dishonest through-out the pendency of the Department's involvement in this case, including lying to her counselor and to the DFS social workers.

These facts are supported by substantial evidence in the record. Mother argues that despite these facts, she has learned to

7

put her children first and that she will no longer allow her husband to have access to the children without the express consent of DFS. However, the facts that were presented at the hearing indicate that Mother has only very recently come to this conviction and given her past history of dishonesty, the court did not misapprehend the effect of the evidence with which it was confronted. Nor given the whole of the record, are we of the firm conviction that the court, here, made a mistake. Therefore, these findings are not clearly erroneous.

The court entered the following conclusions of law:

3. The treatment plans for [Father] and [Mother] were appropriate for the needs of the family. They were not complied with and were not successful. Continuation of the parent-child relationships between [Father] and [Mother] and [J.S.] and [P.S]. will likely result in the continued abuse of these children. [Father's] and [Mother's] conduct and condition renders them unfit, unable or unwilling to provide [J.S.] and [P.S.] with adequate parental care. Their conduct and condition have not changed significantly over the part six (6) months that the Department has been involved, and is unlikely to change within a reasonable time.
[5.] The Court has considered all reasonable efforts to rehabilitate [Father] and [Mother] and to reunite them with [J.S]. and [P.S.] This Court has given primary consideration to the physical, mental, and emotional needs of [J.S.] and [P.S.]
[6.] It is in [J.S.] and [P.S's] best interests to terminate the parent-child legal relationships between [Father] and [Mother] and [J.S.] and [P.S.] and to award permanent custody of [J.S.] and [P.S.] to the Montana Department of Family Services with authority to assent to adoption.

The court correctly used § 41-3-609, MCA, in evaluating the evidence it had before it. The pertinent parts of that statute are as follows:

(1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:

8

. . . .
(c) the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time, . .

(2) In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court must enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care. In making such determinations, the court shall consider but is not limited to the following:
. . .
(g) any reasonable efforts by protective service agencies that have been unable to rehabilitate the parent.

(3) In considering any of the factors in subsection (2) in terminating the parent-child relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child. The court shall review and, if necessary, order an evaluation of the child's or the parent's physical, mental, and emotional conditions. (Emphasis added.)

A close reading of the court's order shows that the court applied the correct law and correctly evaluated the law.

Nothing in the record suggests that Mother has totally understood the destruction she and her husband have afforded these children. Nothing here indicates that she will be able to protect the children from Father's abuse. Father could be released as soon as two years (his original sentence was 10 years) and despite Mother's assertion that he will not be released for a long time, this is not at all certain. Father testified that he wanted to take advantage of the sexual offender program, but the facts show that he had done nothing prior to the hearing that would indicate

9

his intention to follow through on this. The law requires that the court consider the welfare of the children first. Thus, the court was charged with the responsibility of weighing the safety of the children against the parents' proclamations of future care and concern.

The record indicates that the children are currently established in foster homes which are providing them the stability they need. J.S. has special needs because of the abuse and because of an attention deficit disorder as well as a lack of social and motor skills. The record indicates that she has improved her behavior since being placed in a foster home. Without any solid indication that the mother has the ability to protect her children or that she will stay away from the abuser, the court correctly determined that the parental rights should be terminated. To date, Mother has shown no concrete indication that she will divorce or separate from the abuser, nor has she stopped seeing him in prison. Father also testified that he had no plans to leave the marriage.

We conclude that the District Court did not abuse its discretion when it terminated the parental rights of the Father and the Mother based upon the court's conclusion that a continued relationship with J.S. and P.S. would result in continued abuse of the children.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

10

John Conway Harrison
_____

William E. Huyett Jr.
_____

_____
Justices

11

Justice Karla M. Gray, specially concurring.

I specially concur in the Court's opinion, primarily because our standard of review is whether the District Court abused its discretion, but not in all that is said therein. I note that the only appellant in this case is the Mother; thus, the sole issue on appeal is whether the District Court erred in terminating her parental rights. While the Court makes a compelling case throughout its opinion for termination of the Father's parental rights, an issue not before us, the case made with regard to the Mother is significantly less substantial, although sufficient to affirm the District Court's exercise of its discretion.

There can be no question about the critical importance of protecting children from sexual abuse. However, there also can be no question that a parent's right to parent her children is a basic and fundamental right which must be accorded due regard.

One of my concerns in this case continues a long-standing concern about some of the DFS' approaches and procedures in cases of this type. A treatment plan is intended to be a good faith, joint effort by both the DFS and the parent to preserve the parent-child relationship and the family unit. I am troubled by the notion that a two-month treatment plan which involves counseling is an "appropriate" treatment plan under § 41-3-609, MCA. Preparing such an abbreviated plan involving counseling strikes me as trapping the parent into an inability to successfully complete the program within the time allotted. Successful results from counseling will not be immediate, and such short-term counseling mandates should not be utilized in treatment plans merely to

12

provide an easy and expeditious opportunity for the government to establish that the parent has not been successful in completing the treatment plan. That is especially true where, as here, the parent actually stayed with the counseling and completed the majority of the treatment plan.

Nor am I convinced that the Mother's continued visits with the Father after his incarceration provide an appropriate basis for so quickly terminating her parental rights. While the Father remained in prison, he could not adversely impact on the children; it is my view that it would have been preferable to provide the Mother with a more realistic chance to reach the necessary and firm realization that her children's best interests had to come before her feelings for the children's father. As reflected by the record before us, the Mother made significant progress in this regard after the ill-fated South Dakota trip.

Notwithstanding my concerns, I cannot conclude that legal requirements were not met here or that the District Court abused its discretion. As a result, I concur in the result reach by the Court, but not in everything that is said in the Court's opinion.

_____
Justice

Justice Terry N. Trieweiler joins in the foregoing special concurrence of Justice Karla M. Gray.

_____
Justice

December 20, 1994

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:


Curtis L. Bevolden
Attorney at Law
Drawer H
Hardin, MT 59034

Hon. Joseph P. Mazurek, Attorney General
~~Carol Schmidt;~~ Assistant *Pam Collins*
Justice Bldg.
Helena, MT 59620

Dennis Paxinos, County Attorney
Denise Ackerman, Deputy
P.O. Box 35025
Billings, MT 59107

Damon Gannett, Esq.
Guardian Ad Litem
P.O. Box 1375
Billings, MT 59103


ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy